

AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Thomas P. Peabody, (312) 353-4307

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

In the Matter of the Search of:

The Google accounts ballmeat57@gmail.com and meatballchampion55@gmail.com, further described in Attachment A-6

Case Number: 23 M 314

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Nina Miller, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A-6**

located in the Northern District of California, there is now concealed:

**See Attachment A-6**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 875(c) and 2261A | Threats in interstate commerce and stalking by use of an interactive computer service or electronic communication service or electronic communication system of interstate |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

_____
*Applicant's Signature*

NINA MILLER, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: March 23, 2023

_____
*Judge's signature*

City and State: Chicago, Illinois

JEFFREY I. CUMMINGS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, NINA D. MILLER, being duly sworn, state as follows:

## I.    **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately August 2020. Before August 2020, I worked with the FBI as a personnel security specialist.

2.      As part of my duties as an FBI Special Agent, I have investigated criminal violations relating to violent crimes, narcotic offenses, firearms offenses, and threat-related offenses. I have been involved in the execution of multiple arrest and search warrants. I have also participated in the execution of search warrants involving the search and seizure of mobile phones and electronically stored information, in conjunction with various criminal investigations.

3.      This affidavit is submitted in support of: six search warrants for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by: (1) Ooma, Inc., headquartered at 525 Almanor Avenue, Suite 200, Sunnyvale, California 94085; (2) TextNow, Inc., headquartered at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833[1]; (3) Pinger, Inc., headquartered at 97 South 2nd Street, Suite 210, San Jose, California 95113; (4)

---

[1] According to TextNow's website, TextNow is headquartered in Canada. The address provided is TextNow's United States office, which responds to United States-based legal process.

Dingtone, Inc., headquartered at 5268 Apennines Circle, San Jose, California 95138; (5) Meta Platforms, Inc., headquartered at 1601 Willow Road, Menlo Park, California 94025; and (6) Google, Inc., headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, (collectively, "Service Providers"). The information to be searched is described in the following paragraphs and in Sections II of Attachments A-1 through A-6, and concerns the following accounts (the "**Subject Accounts**"):[2]

     a.    The Ooma, d/b/a Talkatone, account assigned call number 630-XXX-6465, created on or about March 8, 2022, registered to sabrinacanale21@icloud.com ("Talkatone Number 1")[3];

     b.    The Ooma, d/b/a Talkatone, account assigned call number 773-XXX-6189, created on or about March 11, 2022, registered to kpsftkwcxg@privaterelay.appleid.com ("Talkatone Number 2");

     c.    The Ooma, d/b/a Talkatone, account assigned call number 630-XXX-8320, created on or about June 1, 2022, registered to canale.tina@yahoo.com ("Talkatone Number 3");

     d.    The TextNow account assigned call number 630-XXX-5452, created on or about May 6, 2022, registered to courtpas13@yahoo.com ("TextNow Number 1");

---

[2] These details for the **Subject Accounts** derive from records provided by the Service Providers, and the **Subject Accounts** are described further below.

[3] The Attachments A to this Affidavit and the proposed Warrants contain the full numbers for each of the **Subject Accounts**.

     e.     The Pinger account assigned call number 630-XXX-5198, created on or about April 18, 2022, registered to allyjaloway66@gmail.com, with the ID of 1423881393 ("Pinger Number 1");

     f.     The Pinger account assigned call number 630-XXX-1361, created on or about April 19, 2022, registered to hockeyy6767@gmail.com, with the ID of 1424185021 ("Pinger Number 2");

     g.     The Pinger account assigned call number 630-XXX-6079, created on or about October 13, 2022, registered to robbingill22@gmail.com, with the ID of 1517694661 ("Pinger Number 3");

     h.     The Pinger account assigned call number 630-XXX-4192, created on or about October 13, 2022, registered to robbingill22@gmail.com, with the ID of 1517694661 ("Pinger Number 4");

     i.     The Dingtone, d/b/a Talktone, account assigned call number 708-XXX-6210, with the user ID of 145138318148460 ("Talktone Number 1");

     j.     The Facebook account assigned profile name "Ally Sabrina", created on or about April 18, 2022, with the ID of 100080234992951 ("Facebook Profile 1");

     k.     The Facebook account assigned profile name "J Stoner Stoney", created on or about October 21, 2021, with the ID of 100073929947111 ("Facebook Profile 2");

     l.     Google account ballmeat57@gmail.com, created on or about December 7, 2021, with ID 28323169025 ("Google Account 1"); and

m.      Google account meatballchampion55@gmail.com, created on or about April 9, 2022, with ID 999913519824 ("Google Account 2").[4]

4.      This affidavit is made in support of applications for search warrants under 18 U.S.C. §§ 22703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the Service Providers to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the **Subject Accounts**, including the contents of communications.

5.      This affidavit is based: on my personal knowledge, training, and experience; information I have received from other law-enforcement personnel, including the local law-enforcement agencies and forensic specialists discussed below; my review of certain electronic evidence and law-enforcement reports; my review of consensually made recordings and surveillance footage; records received from various electronic service providers; and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the above-mentioned search warrants, I have not included each and every fact known to me concerning this investigation.

6.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe threat and cyberstalking offenses, in violation of 18 U.S.C. § 875(c) and 18 U.S.C. § 2261A (the "Subject Offenses"), have

---

[4] For each of the **Subject Accounts** discussed herein, the FBI has made multiple preservation requests to the relevant service provider, including, in some cases, three or more requests. *See* 18 U.S.C. § 2703(f). The FBI has not specifically confirmed before the filing of the affidavit that each such requests have been in fact honored with the service providers.

been committed. There is also probable cause to believe that searching the **Subject Accounts**, as described in Section II of Attachments A-1 through A-6, will reveal evidence and instrumentalities of the Subject Offenses, as described in Sections III of Attachments A-1 through A-6.

7.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## II.     BACKGROUND ON SERVICE PROVIDERS

### A.     TEXTING APPLICATIONS

8.     Based on my experience and publicly available sources, including texting applications' websites, I have learned the following about texting mobile applications:

a.     The texting applications discussed in this affidavit develop and offer to the public mobile applications. Users download the applications on their devices and input their user information. Based on my experience in this investigation, certain texting applications require user verification (through text message or email, for example); but many of the texting applications do not require user verification before the user's account becomes accessible. Through the application, depending on the Service Provider, users can send multimedia messages (such as "Short Message Service" ("SMS") or "Multimedia Messaging Service"

("MMS") messages) or make phone calls through WiFi or broadband cellular technology (such as 3G, 4G, 5G, or LTE).

b.     The texting applications assign users telephone numbers. Typically, users may select a geographic region so as to receive a particular local area code or set of codes. Based on my experience and according to publicly available sources, users are assigned the numbers on a temporary basis. Depending on the Service Provider, the numbers may expire for the user after a certain period of inactivity or after a particular timeframe. For example, according to the publicly available information, Burner permits a seven-day free trial; Pingers' users' numbers are recycled after 30 days of inactivity; TextPlus's numbers are reclaimed after seven days of inactivity; TextNow recommends users use the number at least once every two days to prevent expiration; and TextMe will not reassign a number so long as it is used at least once every two weeks. These periods are only examples, and the length of the number's availability may depend on, among other factors, the specific service for which the user pays or otherwise uses. While the texting applications charge users for certain functionalities—like voicemail, voicemail transcription, or prolonged service—they generally permit text functionality from temporary numbers free of charge or for a relatively small charge.

c.     Based on my experience and according to records received from the texting applications, stored electronic communications, including retrieved and unretrieved voicemail, text messages, and multimedia messages, may be located on the computers of the texting applications. I am aware that computers located at or

6

controlled by the texting applications contain information and other stored electronic communications belonging to unrelated third parties.

  d. Further, the texting applications retain user and content information for their assigned numbers. This may include, among other information, subscriber information, the contents of voicemails, texts, multimedia messages, IP addresses, call or messaging logs, and communications or correspondence with users, including regarding user verification, technical problems, complaints, or billing inquiries.

  e. Based on company websites and records, none of the texting applications discussed herein—including Burner, TextNow, TextMe, Ooma, and Dingtone—are located in the state of Illinois. Each is a mobile application, which requires data or Internet connection to operate.

  **B.** **FACEBOOK**

9. Based on my training and experience, and the training and experience of other law enforcement officers, I have learned the following about Facebook:

  a. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

  b. Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may

include the user's full name, birth date, contact email addresses, physical address, telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

c. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

d. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

e. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs,

8

articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

       f.    Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them. Photos taken by a digital camera or smartphone typically include an Exchangeable Image File ("EXIF") data, which often includes the date, time, type of device, and geolocation for the photo. Facebook removes EXIF data from photos that are uploaded by users but retains a copy of that information. Facebook also retains other location information about users unless these settings are disabled.

       g.    Facebook users can exchange private messages on Facebook with other users or through the "Messenger" application. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook Messenger, which also stores copies of messages sent by the recipient, as well as other

information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

h.      If a Facebook user does not want to interact with another user, the first user can "block" the second user from seeing his or her Facebook account.

i.      Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

j.      Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

k.      Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

l.      A Facebook user may opt for "notifications" of many of the above listed events (e.g., receiving a message or a friend request) to be sent to an email address associated with the user's Facebook account. From personal experience, I know that in the case of messages, this "notification" email includes the entire text of the message from the user's Facebook Inbox.

m.      Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

n.      The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

o.      Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

p.      In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use may appear on the user's profile page.

q.      Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following

information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

     r.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

     s.    Facebook keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

     t.    Facebook's Data Policy states that, if users' settings allow, Facebook retains location information, including GPS, WiFi, or Bluetooth location data for users.

u.      Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

v.      Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A-5. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A-5.

### C. GOOGLE

10. Based on my training and experience and information available from Google's website (google.com), I have learned the following information about Google and Gmail:

a. Google offers a collection of Internet-based services, including e-mail and online data storage, which is owned and controlled by Google. The services are available at no cost to Internet users, though there are certain options, such as additional online data storage, that users may elect to pay money to receive. Subscribers obtain an account by registering on the Internet with Google and providing Google with basic information, including name, gender, zip code, and other personal/biographical information. Subscribers are given a Google account which ends in "@gmail.com" which is utilized to access these online services.

b. Google maintains electronic records pertaining to the individuals and entities who maintain Google online subscriber accounts. These records often include account access information, e-mail transaction information, account application information, and in some circumstances billing and payment information.

c. Any e-mail that is sent to a Google online account subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Google. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

d.      When a subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google online account users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail may remain on the system indefinitely.

e.      Google online account subscribers can store files, including but not limited to e-mails, documents, and image files, on servers maintained and/or owned by Google. The online data storage service is known as "Google Drive."

f.      Google online account subscribers can also utilize a feature known as "History" that allows a user to track various historical account activity, including past Google Internet searches performed, information regarding devices which have been used to login to the Google online account, and physical location information regarding from where the Google online account was accessed.

g.      Google keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

h.      Google also offers its users a service called "Google Play," a digital distribution service operated and developed by Google. Google Play users are able to download applications from the Google Play store for use on their devices.

11.     Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information

concerning subscribers and their use of Google, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Google, to protect the rights of the subjects of the investigation and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A-6. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A-6.

## III. PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNTS

12. On or about December 8, 2022, SABRINA CANALE was arrested based on a criminal complaint charging her with violating 18 U.S.C. § 2261A(2)(B).[5] As set forth in that complaint, attached hereto as Exhibit A,[6] there is evidence—in the form of provider records, cellular-phone data, and recordings—showing that, between

---

[5] Chief Judge Pallmeyer has since granted unopposed orders extending the time to indict under the Speedy Trial Act.

[6] Exhibit A identified five phones believed to be used by SABRINA CANALE, including CANALE Phone 3 and CANALE Phone 4. Ex. A ¶ 10.a. As explained in the affidavit, CANALE Phone 3 and CANALE Phone 4 had the same call number and the same IMSI number but operated on separate devices. Ex. A. ¶ 10.a.ii. & nn. 4-5. As explained further in the affidavit, CANALE Phone 3 was a Motorola Android device, *id.* ¶ 48 n.28, and according to interviews, on or about March 28, 2022, the defendant began using a Samsung Galaxy 03 device (CANALE Phone 4) by transferring the SIM card from CANALE Phone 3 to CANALE Phone 4, *id.* ¶ 144.e. Paragraphs 142 and 143 of the affidavit inadvertently identified CANALE Phone 4 as CANALE Phone 3, which again share the same call number and IMSI. In addition, Paragraphs 144.f. and 152 identified CANALE Phone 3, when, based on the date of the event (i.e., after March 28, 2022), they should have listed CANALE Phone 4.

In addition, in Paragraph 99 of Exhibit A, it states: "The user of phone number 224-XXX-1893 messaged Individual A saying…" That sentence should have read, "The user of phone number 224-XXX-1893 messaged Individual <u>B</u> saying…"

November 2021 and October 2022, CANALE used interactive computer services and electronic communication services to engage in a course of conduct that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to a person, in violation of § 2261A(2)(B), as well as transmitting in interstate commerce a threat, in violation of 18 U.S.C. § 875(c).

13. This affidavit concerns the **Subject Accounts**, which were generally used to harass and threaten various individuals, as described below. As noted above, the service providers at issue here retain various forms of data, including message content, IP addresses, log-in data, and other information regarding an individual's use of the **Subject Accounts**. Based on my training and experience, as well as my familiarity with this investigation and the providers, such information will likely help establish the user of the **Subject Accounts**, which in turn will establish instrumentalities and evidence of the Subject Offenses. In addition, with respect to the **Subject Accounts** from Google, such information will likely show SABRINA CANALE's use of those accounts to operate other **Subject Accounts**, for example, by showing the downloading of the text-messaging applications at issue through her Google accounts or corresponding messages with the other **Subject Accounts**' providers.

### A. BACKGROUND AND RELATIONSHIPS

14. As set forth at greater length in Exhibit A, the FBI's investigation concerns at least 2,800 harassing or threatening messages to various individuals from

unknown or blocked numbers. The FBI's investigation involves several individuals, some of whom are identified and whose relationships are described below.

a.      SABRINA CANALE is a 23-year-old woman.

b.      Individual A is a 54-year-old woman and SABRINA CANALE's relative.

c.      Individual B is a 48-year-old woman and a relative of Individual C (described below). Based on reports from the Hanover Park Police Department ("HPPD"), as well as interviews of Individual A and Individual B, Individual A and Individual B are friends.

d.      Individual C is a 21-year-old woman and is Individual B's relative. Based on HPPD reports, photographs, and text messages obtained in consented-to data cellphone extractions, SABRINA CANALE and Individual C are friends.

e.      Individual D is a 49-year-old woman and is the relative of Individual E (described below).

f.      Individual E is an 18-year-old female. For the majority of this investigation, Individual E was a 17-year-old minor female.

g.      Individual F is a 21-year-old woman. According to Carol Stream Police Department reports, Individual F is a friend of SABRINA CANALE and Individual C.

h.      Individual G is an 82-year-old woman and the relative of Individual A and SABRINA CANALE.

i.　　Individual H is a 26-year-old man and the significant other of SABRINA CANALE.

**B.　TEXTING APPLICATIONS**

15.　As described below, the **Subject Accounts** have been used to engage in the Subject Offenses. The user of the **Subject Accounts** have used them to send death threats, indicate that the victims are being watched or followed, and otherwise threaten, harass, and stalk the victims, and/or create others of the **Subject Accounts** used to do so.

**1.　Ooma, Inc. d/b/a Talkatone**

**a.　Talkatone Number 1**

16.　According to Individual B, beginning on or about March 8, 2022, Individual B began receiving harassing and threatening messages from Talkatone Number 1. The user of phone number Talkatone Number 1 messaged Individual B, stating "I'm coming for you [Individual B]!!!! Wait until your house ,car ,kids are GONE!" Images of the messages are below[7].

---

[7] The sequence of each subset of images in this affidavit are based on timestamps in images and/or order of receipt from Individuals. In each case, they do not necessarily reflect the true chronological order in which the messages were received. Individuals sent the FBI screenshots of the harassing and threatening messages and on multiple occasions Individuals would send images on behalf of other individuals. The affidavit notes the individual to whom harassing and threatening messages were sent, and not necessarily the individual who forwarded the messages to the FBI. I have redacted the first or full names of individuals in the images of the text messages; in the margins, I have identified the individuals referenced by the monikers used above. Moreover, I have added in brackets my interpretation of certain messages throughout this affidavit.



Individual C

Individual B

17.    According to records from Inteliquent, a voice-messaging software company, Talkatone Number 1 is subscribed to and owned by Ooma.[8] According to records from Subsentio, the account holding Talkatone Number 1 was activated on March 8, 2022. Subsentio records indicate Talkatone Number 1 was assigned to the account on or about March 8, 2022 at 11:59 a.m. According to Subsentio records, the associated email address for Talkatone Number 1 was sabrinacanale21@icloud.com. According to Apple records, sabrinacanale21@icloud.com is registered to SABRINA CANALE.

---

[8] According to Inteliquent records, Talkatone Number 1 is owned by Ooma. When a records request was made to Ooma, the records were provided by Subsentio and list Talkatone as the application.

### b. Talkatone Number 2

18.    According to Individual A, beginning on or about March 12, 2022, Individual A began receiving harassing and threatening messages from Talkatone Number 2. The user of Talkatone Number 2 messaged Individual A, calling Individual A a "pussy" and stating "Haha I heard what [Individual B] said at her house". Images of the messages are below.



19.    According to Inteliquent records, Talkatone Number 2 is subscribed to and owned by Ooma. According to Subsentio records, the account holding Talkatone Number 2 was activated on March 11, 2022. Subsentio records indicate Talkatone Number 2 was assigned to the account on or about March 12, 2022 at 9:38 a.m. until

9:52 a.m. According to Subsentio records, the associated email address for Talkatone Number 2 was kpsftkwcxg@privaterelay.appleid.com.[9]

### c.    Talkatone Number 3

20.    According to Individual A, beginning on or about May 31, 2022, Individual A began receiving harassing and threatening messages from Talkatone Number 3. The user of Talkatone Number 3 messaged Individual A, calling Individual A a "pussy" and claiming to know details of the FBI's investigation. Images of the messages are below.



Individuals B & C

21.    According to Inteliquent records, Talkatone Number 3 is subscribed to and owned by Ooma. According to Subsentio records, the account holding Talkatone Number 3 was activated on June 1, 2022.[10] Subsentio records indicate Talkatone Number 3 was assigned to the account on or about May 31, 2022 at 8:01 p.m. According to Subsentio records, the associated email address for Talkatone Number

---

[9] Based on my training and experience, as well as publicly available information, this email address is an Apple Private Relay address, which is a randomized address provided by Apple to third parties to obfuscate the user's true address. Apple records also indicate that this email address is associated with SABRINA CANALE's known iCloud email address.

[10] Subsentio records do not give a timestamp for account activation. Records are in UTC.

3 was canale.tina@yahoo.com. According to emails exchanged with Individual A and local law enforcement on or about November 23, 2021, canale.tina@yahoo.com is Individual A's email address.

22.  Talkatone Number 3 was created and used to send harassing and threatening messages to Individuals after a search warrant was executed at SABRINA CANALE's residence on or about April 29, 2022, and four of SABRINA CANALE's phones were seized. According to Subsentio records, the account holding Talkatone Number 3 was created with a "Google octopus octopus – x86_64" device with device ID 774d4277220e3ce6. A records request was made to Google for device ID 774d4277220e3ce6. Google was unable to identify the device based on the device ID. Based on open-source searches, "Octopus" may be a device name associated with a Google Chromebook. According to an interview of Individual A on or about January 21, 2022, Individual A owns a Google Chromebook laptop which is used by her family members.

### 2.  TextNow, Inc.

#### a.  TextNow Number 1

23.  According to Individual B, beginning on or about May 6, 2022, Individual B began receiving harassing and threatening messages from TextNow Number 1. The user of TextNow Number 1 messaged Individual B that "hahahahaha [Individual C] is next dont you worry" and "they (believed to be a reference to SABRINA CANALE and Individual C) will sit in jail mark my fuckin words buck teeth bitch". Images of the messages are below.

   

Individual C

   

Individual C

   

Unknown individual

Individual C

 

Unknown individuals

24

24. According to Bandwidth records, TextNow Number 1 is subscribed to and owned by TextNow. According to TextNow records, email courtpas13@yahoo.com was the user of TextNow Number 1 from approximately May 6, 2022 at 1:25 p.m. until May 9, 2022 at 10:59 p.m. According to Yahoo records, it does not have any records of account holders for courtpas13@yahoo.com. According to TextNow records, the registration IP for courtpas13@yahoo.com used on or about May 6, 2022 at 1:24 p.m. was 71.194.122.250. According to Comcast, IP address 71.194.122.250 was registered to Individual A at Individual A and SABRINA CANALE's home address on May 6, 2022 at 1:24 p.m.

### 3. Pinger, Inc.

#### a. Pinger Number 1

25. According to SABRINA CANALE, beginning on or about April 18, 2022, SABRINA CANALE began receiving harassing and threatening messages from Pinger Number 1. The user of Pinger Number 1 messaged SABRINA CANALE that the user "Will be making multiple accounts and adding everyone from around here:) my guys will have control over the Facebook page don't worry it's going to get ugly now." The user of phone number Pinger Number 1 attached a screenshot of a Facebook page with profile name "Ally Sabrina" (Facebook Profile 1) claiming Individual C and SABRINA CANALE were prostitutes. Images of the messages are below.



26.     According to Bandwidth records, Pinger Number 1 is subscribed to and owned by Pinger. According to Pinger records, Pinger Number 1 was used by account ID 1423881393, and the creation date was listed as approximately April 18, 2022 at 9:43 a.m. Pinger records indicate Pinger Number 1 was assigned to the account on April 18, 2022 at approximately 9:43 a.m., with a registered email address of allyjaloway66@gmail.com. According to Google returns, it does not have any records of account holders for this email address.

27.     According to Pinger records, Pinger Number 1 was used by a Google Android device. According to an interview of SABRINA CANALE on April 19, 2022, SABRINA CANALE was using a Google Android device at the time. According to

Pinger records, the registration IP for Pinger Number 1 used on or about April 18, 2022 at 9:43 a.m. was 71.194.122.250. According to Comcast records, IP address 71.194.122.250 was registered to Individual A at Individual A and SABRINA CANALE's home address on April 18, 2022 at approximately 9:43 a.m.

<b>b.    Pinger Number 2</b>

28.    According to SABRINA CANALE, beginning on or about April 19, 2022, SABRINA CANALE and Individual C began receiving harassing and threatening messages from Pinger Number 2. The user of Pinger Number 2 messaged SABRINA CANALE and Individual C calling them "whores" and said "My guys will get you two don't worry" and that "my guys will be all around ur house now that I know [Individual H] is back at work this this easy hahaha." Images of the messages are below.



29.    According to Bandwidth records, Pinger Number 2 is subscribed to and owned by Pinger. According to Pinger records, Pinger Number 2 was used by account

ID 1424185021, and the creation date was listed as approximately April 19, 2022 at 9:26 a.m. Pinger records indicate Pinger Number 2 was assigned to the account on April 19, 2022 at 9:27 a.m., with a registered email address of hockeyy6767@gmail.com. According to Google records, it does not have any records of account holders for hockeyy6767@gmail.com.

30.     According to Pinger records, phone number 630-XXX-1361, Pinger Number 2, was used by a Google Android device. According to an interview of SABRINA CANALE on April 19, 2022, SABRINA CANALE was using a Google Android device at the time. According to Pinger records, the registration IP for Pinger Number 2 used on or about April 19, 2022 at 9:26 a.m. was 71.194.122.250. According to Comcast, IP address 71.194.122.250 was registered to Individual A at Individual A and SABRINA CANALE's home address on April 19, 2022 at approximately 9:26 a.m.

### c.     Pinger Number 3

31.     According to Individual B, on or about October 13, 2022 between 8:45 p.m. and 10:00 p.m., Individual B received harassing and threatening messages from Pinger Number 3. The user of Pinger Number 3 messaged Individual B, stating "You think you are getting help bitch my guys KNOW EVERYTHING" and "the FBI are coming for both daughters yours and [SABRINA CANALE]". Images of the messages are below.

Individual A





Individual C

Individual E



32. According to Bandwidth records, Pinger Number 3 is subscribed to and owned by Pinger. According to Pinger records, Pinger Number 3 was used by account ID 1517694661, and the creation date was listed as approximately October 13, 2022

at 8:55 p.m. Pinger records indicate Pinger Number 3 was assigned to the account on or about October 13, 2022 at 9:11 p.m., with a registered email address of robbingill22@gmail.com. According to Google records, it does not have any records of account holders for robbingill22@gmail.com.

33.     According to Pinger records, Pinger Number 3 was used by a Google Android device. According to Verizon records, SABRINA CANALE was using a Google Android device at the time. According to Pinger records, the registration IP for Pinger Number 3 used on or about October 13, 2022 at 8:55 p.m. was 174.240.253.84 which is owned by Verizon. According to Verizon records, SABRINA CANALE was using a Verizon device at this time. According to Verizon records, phone number 224-840-5805 accessed IP address 174.240.253.84 on or about October 13, 2022 at approximately 8:40 p.m. to October 14, 2022 at approximately 12:12 p.m. According to a DCSO report taken on or about October 12, 2022, SABRINA CANALE was using a device with telephone number 224-XXX-5805.

### d.     Pinger Number 4

34.     According to Individual B, on or about October 13, 2022 between 8:45 p.m. and 10:00 p.m. Individual B received harassing and threatening messages from Pinger Number 4. The user of Pinger Number 4 messaged Individual B, stating "Don't worry little bitch I'm coming for you fucks" and "I'm using [Individual C's] phone number next to call 911 saying a fire to [Individual A's] mom's (Individual G) house". Images of the messages are below.

**Individual F**

it hell for ▮ ▮'ll be sending food orders all night this weekend

**Individual C**

As long as ▮ car or sabrinas car is there I have trackers on them LOL

Shit will get ugly I have the lawyers phone number and don't worry bitch ahahah just WAIT

**Individual C**

what I DID I PUT ▮ NUDES ON IT hahah

8:56 PM

Texting with (630) 720-4192 (SMS/MMS)

Hahah don't worry bitch I'm planting lots of stuff in ▮ phone haha she keeps connecting to Bluetooth and I planted some apps haha she has it on for me ;) thanks ▮

Don't worry little bitch it's coming for you fucks oh and even bet ▼ I put your

you fucks oh and even better I put your social security card on little ▮ s moms phone haha she has no idea

**Individual A**

I'm doing BIG THINGS BITCH

**Individual C**

I'm using ▮ phone number next to call 911 saying a fire to ▮ s mom

**Individual C**

**Individual A**

And I see sabrina and ally have been by ▮ s house hahah I'll ▼ ike it hell for ▮ I'll

**Individual F**



Don't worry bitch

It's coming hahahs

The FBI will be back tomorrow for Sabrina what I heard on Tuesday

They even said they are going t catch Sabrina alone bc you guys all help her is what I heard hahahs

I can't wait for this to go down

28 min

Hahaha   Haha   Wow   Me too



**Individual C**

I'm in ▮ s snap I have some pretty spicy convos to send to ▮

**Individual C's significant other**

Don't worry bitch

It's coming hahahs

The FBI will be back tomorrow for Sabrina what I heard on Tuesday

They even said they are going t catch Sabrina alone bc you guys all helo her is what I he ▼ l hahahs

35.     According to Bandwidth records, Pinger Number 4 is subscribed to and owned by Pinger. According to Pinger records, Pinger Number 4 was used by account ID 1517694661 with the creation date listed as October 13, 2022 at approximately 8:55 p.m. Pinger records indicate Pinger Number 4 was assigned to the account on October 13, 2022 at 8:55 p.m. until 9:11 p.m., with a registered email address of robbingill22@gmail.com. According to Google records, it does not have any records of account holders for robbingill22@gmail.com.

36.     According to Pinger records, Pinger Number 4 was used by a Google Android device. According to Verizon records, SABRINA CANALE was using a Google Android device at the time. According to Pinger records, the registration IP for Pinger Number 4 used on or about October 13, 2022 at 8:55 p.m. was 174.240.253.84, which is owned by Verizon. According to Verizon records, SABRINA CANALE was using a Verizon device at this time. According to Verizon records, phone number 224-XXX-5805 accessed IP address 174.240.253.84 on or about October 13, 2022 at approximately 8:40 p.m. to October 14, 2022 at approximately 12:12 p.m. According to a DCSO report taken on or about October 12, 2022, SABRINA CANALE was using a device with telephone number 224-840-5805.

### 4.     Dingtone, Inc. d/b/a Talktone

### a.     Talktone Number 1

37.     According to Individual C, beginning on or about June 20, 2022, Individual C began receiving harassing and threatening messages from Talktone Number 1. The user of Talktone Number 1 messaged Individual C, calling Individual

C a "loser ass bitch" and stated "FBI can't stand you and [SABRINA CANALE] and I'm in [Individual F] phone got ur number right from there!". Images of the messages are below.

   

Individual F     Individual C's significant other

  Individual C's significant other

38. According to Individual A, beginning on or about June 20, 2022, Individual A began receiving harassing and threatening messages from Talktone Number 1. The user of Talktone Number 1 messaged Individual A saying "[Individual C] and [SABRINA CANALE] are the only two being looked at and they are screwed

33

mark my words !!!" and calling Individual A a "pussy". Images of the messages are below.



39.     According to Inteliquent records, Talktone Number 1 is subscribed to and owned by Talktone. According to Dingtone records, Talktone is owned by Dingtone. According to Dingtone records, the account holding Talktone Number 1 was first logged into on or about June 20, 2022 at 7:20 p.m. and last logged into on or

about June 20, 2022 at 7:47 p.m. According to Dingtone records, the user ID for Talktone Number 1 during the relevant time period was 145138318148460, the public ID was 173667052, and the registration IP for Talktone Number 1 used on or about June 20, 2022 at 7:20 p.m. until 7:47 p.m. was 71.194.122.250. According to Comcast, IP address 71.194.122.250 was registered to Individual A at Individual A and SABRINA CANALE's home address on June 20, 2022 at approximately 7:20 p.m. through 7:47 p.m.

### C. FACEBOOK

#### 1. Facebook Profile 1

40.     During an April 19, 2022 interview of SABRINA CANALE, SABRINA CANALE claimed to have received a text message from Facebook on or about April 18, 2022 with a confirmation code. SABRINA CANALE also claimed to have received a screenshot of Facebook Profile 1 on or about April 18, 2022 at approximately 9:46 a.m., which claimed SABRINA CANALE and Individual C were prostitutes and contained a photo of SABRINA CANALE and Individual C together. SABRINA CANALE alluded Individual D sent the photo and that Individual D has previously posted the same photo seen in Facebook Profile 1 on Individual D's personal Facebook page.

41.     According to returns from Facebook, phone number 602-XXX-1103 was used to verify Facebook Profile 1 on April 18, 2022 at approximately 9:10 a.m. According to an interview of Individual A, 602-XXX-1103 was used by SABRINA CANALE beginning on or about February 11, 2022. According to a pen register on

35

phone number 602-XXX-1103, SABRINA CANALE received a text message from Facebook on April 18, 2022 at approximately 9:10 a.m.

42.     According to a consent extraction of the device with phone number 602-XXX-1103[11], SABRINA CANALE had a screenshot of Facebook Profile 1 saved in the images on her phone. Metadata extracted from the photo lists the capture time as April 18, 2022 at approximately 9:40 a.m., approximately six minutes before SABRINA CANALE received the photo via text message. Further, according to a Cellebrite extraction of 602-XXX-1103 pursuant to a search warrant executed on April 29, 2022, Facebook Profile 1 was logged as a User Account on the device with phone number 602-XXX-1103.

### 2.     Facebook Profile 2

43.     According to Individual E, on an undetermined date, Individual E received harassing messages through Facebook from a profile named "J. Stoner Stoney" (Facebook ID 100073929947111) ("Facebook Profile 2"). The user of Facebook Profile 2 sent messages which said "Will be by your house tonight I have a gun" and "Fuck ur dad who's in kkk will shoot him too." Images of the messages are below.

---

[11] SABRINA CANALE used two different devices with phone number 602-XXX-1103, a Motorola Moto Android Device and a Samsung Galaxy Android Device.



44.     According to Facebook[12] records, Facebook Profile 2 was created on or about October 21, 2021 at 9:45 a.m. and was verified by 630-XXX-2110. According to HPPD reports, 630-XXX-2110 was used by SABRINA CANALE from approximately September 2021 until approximately January 2022.

45.     According to T-Mobile returns for 630-XXX-2110, SABRINA CANALE sent one message and received three messages from a phone number believed to belong to Facebook on October 21, 2021[13] at approximately 9:45 a.m. Further,

---

[12] Facebook is owned by Meta Platforms, Inc. For the purposes of this affidavit, Meta Platforms, Inc. is referred to by its former name, Facebook.

[13] As the result of a typographical error, Exhibit A listed this date, and the subsequent date listed in this paragraph, as October 21, 2022.

according to Facebook records, Facebook Profile 2 was created with IP address 2607:fb90:a3c3:ee95:9c8c:dc21:52d0:3e44 on October 21, 2021 at approximately 9:45 a.m. According to T-Mobile records, IP address 2607:fb90:a3c3:ee95:9c8c:dc21:52d0:3e44 was assigned to 630-XXX-2110 on October 21, 2021 at approximately 9:45 a.m.

### D. GOOGLE

#### 1. Google Account 1

46. According to Individual B, beginning on or about March 6, 2022, Individual B began receiving harassing and threatening messages from phone number 217-XXX-8637. The user of phone number 217-XXX-8637 messaged Individual B to wait until Individual A's mom, Individual G, is "DEAD", and alleged in which direction Individual G was sleeping. Images of the messages are below.





47. Additionally, on or about March 6, 2022, the user of phone number 217-XXX-8637 messaged Individual C, calling individual C a "stank ass whore" and a "pussy." Images of the messages are below.



48. According to Inteliquent records, phone number 217-XXX-8637 is subscribed to and owned by TextMe, a voice-messaging software company. TextMe is

a mobile application for iOS and Android that allows users to create temporary telephone phone numbers, from which users can send text messages or make calls. TextMe permits users to select a geographic area and will provide a number with an associated area code. According to TextMe's website, TextMe is located in California.

49.     According to TextMe records, the account holding 217-XXX-8637 was created on or about December 8, 2021, at approximately 6:03 p.m., and the registered email address was Google Account 1. TextMe records indicate the account was created using an AT&T IP address with a Motorola-Moto G Play (2021) (10) or a Motorola-Moto G Play (2021) (11) device. Based on publicly available information, such devices use on a Google-based (or Android) operating system.

50.     According to TextMe records, phone number 217-XXX-8637 was assigned to the account on or about March 6, 2022 at 12:32 a.m. TextMe records did not list an end date for the phone number.

51.     According to interviews of Individual A and Individual B, at the time the phone number ending in 8637 was used to send harassing messages, CANALE was using phone number 602-XXX-1103, a Motorola Moto phone registered to AT&T. Based on publicly available information, such devices use on a Google-based (or Android) operating system. According to Google records for Google Account 1, phone number 602-XXX-1103 is listed as both the account recovery SMS phone number as well as the sign-in phone number.

### 2. Google Account 2

52. According to Individual B, beginning on or about April 26, 2022, Individual C began receiving harassing and threatening messages from phone number 312-XXX-1884. The user of phone number 312-XXX-1884 messaged Individual C regarding a fake Facebook account claiming Individual C was a prostitute. Individual C reported the messages to the DCSO but did not send law enforcement photos of the messages.

53. According to Inteliquent records, phone number 312-XXX-1884 is subscribed to and owned by TextMe. According to TextMe records, the account holding 312-XXX-1884 was created on or about April 26, 2022 at approximately 10:43 a.m., and the registered email address was Google Account 2. TextMe records indicate the account was created using a Comcast IP Address which was registered to Individual A at the time. TextMe records did not list a device type.

54. According to TextMe records, phone number 312-XXX-1884 was assigned to the account on or about April 26, 2022 at approximately 10:44 a.m. TextMe records did/did not list an end date for the phone number. According to interviews of Individual A and Individual B, at the time the phone number ending in 1884 was used to send harassing messages, CANALE was using phone number 602-XXX-1103 with a new device, a Samsung Galaxy registered to AT&T. Based on publicly available information, such devices use on a Google-based (or Android) operating system.

55. According to a consent search completed by the FBI of the Samsung Galaxy device with phone number 602-XXX-1103 on or about April 18, 2022, CANALE was logged into the Google Play Store on the CANALE Phone with Google Account 2.

## IV. CONCLUSION

56. Based on the foregoing facts, I submit that there is probable cause that the Subject Offenses have been committed, and that information associated with the **Subject Accounts** will reveal evidence and instrumentalities of the Subject Offenses.

FURTHER AFFIANT SAYETH NOT.

NINA D. MILLER
Special Agent, Federal Bureau of
Investigation

SUBSCRIBED AND SWORN to before me on March 23, 2023.

Honorable Jeffrey I. Cummings
United States Magistrate Judge

## ATTACHMENT A-6

### I. Search Procedure

1.      The search warrant will be presented to Google personnel, who will be directed to isolate those accounts and files described in Section II below.

2.      In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.      Google employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant. Google shall disclose responsive data, if any, by sending to 1600 Golf Road, Suite 1050, Rolling Meadows, Illinois 60008, using the US Postal Service or another courier service, notwithstanding 18 U.S.C. § 2252A or similar statute or code.

4.      Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

### II. Files and Accounts to be Copied by Employees Of Google

To the extent that the information described below in Section III is within the possession, custody, or control of Google, which are stored at premises owned,

maintained, controlled, or operated by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043, Google is required to disclose the following information to the government for the following accounts: (1) ballmeat57@gmail.com with ID 28323169025 and (2) meatballchampion55@gmail.com with ID 999913519824 (together, the "**Subject Accounts**"),

   a. All available account contents from inception of account to present, including e-mails, attachments thereto, drafts, contact lists, address books, and search history, stored and presently contained in, or maintained pursuant to law enforcement request to preserve.

   b. All electronic files stored online via Google Drive, stored and presently contained in, or on behalf of the accounts described above.

   c. All search history records stored and presently contained in, or on behalf of the accounts described above including, if applicable, web and application activity history (including search terms), device information history, and location history.

   d. All existing printouts from original storage of all the electronic mail described above.

   e. All transactional information of all activity of the electronic mail addresses and/or individual accounts described above, including any Google Play account, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations.

f. All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses, Google Play, and/or Google Voice accounts described above, including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing and payment records.

g. All records indicating the services available to subscribers of the electronic mail addresses, Google Play, and/or Google Voice accounts described above.

h. All account contents previously preserved by Google, in electronic or printed form, including all e-mail, including attachments thereto, Google Play and Google Drive stored electronic files for the accounts described above.

i. All subscriber records for any Google account associated by cookies, recovery email address, or telephone number to the accounts described above.

j. All text messages and voicemails store in the Google Voice account described above (for the time period January 1, 2021, through the present).

## III. Information to be Seized by Law Enforcement Personnel

All information described above in Section II that constitutes evidence and instrumentalities concerning violations of Title 18, United States Code, Section 875(c), and Title 18, United States Code, Section 2261A (threats and stalking in interstate communication, or "**Subject Offenses**"), as follows:

1. Items related to the identity of the user or users of the **Subject Accounts**, including items concerning those who the use or users of the **Subject**

3

**Accounts** have messaged, or vice versa, which help establish the identity of the user or users of the **Subject Accounts**.

2.      Items related to the physical location of the users of the **Subject Accounts**.

3.      Items related to the identities and contact information of participants in or witnesses to the **Subject Offenses**.

4.      Items related to the **Subject Offenses**.

5.      Threats in interstate communication;

6.      Harassing communications made in interstate commerce or by electronic computer service or system or interactive computer service;

7.      Items related to firearms, explosive, or other dangerous weapons;

8.      Items that contain references to or information regarding individuals who have received threatening or stalking communications as described in the affidavit;

9.      All of the non-content records described above in Section II.

## ADDENDUM TO ATTACHMENT A-6

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant requires the recipient of the warrant to copy and produce the contents of an electronic account so that they may be reviewed in a secure environment for information consistent with the warrant.

The account provider shall provide the government only data that fall within the criteria as described in Attachment A(I), which may either be the entire contents of an account or only a subset of an account.

The government's review of the data shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate only those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment A (III).

The review of electronically stored information contained in the account described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures that minimize the review of information not within the list of items to be seized as set forth in Attachment A(III):

a. examination of categories of data contained in the account to determine whether that data falls within the items to be seized as set forth in Attachment A(III);

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment A(III);

c surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment A(III);

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment A(III); and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment A(III).

5

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment A(III). To the extent that materials produced by the account provider pursuant to this search warrant contain evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.